K41dstec
Teleconference

1  UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

2  ------------------------------x

3  BARBARA STEWART,

4              Plaintiff,              New York, N.Y.

5        v.                           19 Civ. 5960(NRB)

6  MICHELE STEWART a/k/a Michele
Bouman-Stewart,

7
              Defendant.

8  ------------------------------x

9
                                  April 1, 2020
10                                 12:07 p.m.

11  Before:

12              HON. NAOMI REICE BUCHWALD,

13                                  District Judge

14              APPEARANCES (via teleconference)

15  MARCUS & CINELLI, LLP
        Attorneys for Plaintiff
16  BY:  DAVID P. MARCUS
        EDWARD P. YANKELUNAS
17
18  MEYNER AND LANDIS LLP
        Attorneys for Defendant
19  BY:  DAVID GRANTZ
        CATHERINE PASTRIKOS KELLY

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K41dstec
                            Teleconference

 1              (Teleconference established)

 2              THE COURT:  Good morning.  This is Judge Buchwald.

 3              ALL COUNSEL:  Good morning, Judge.

 4              THE COURT:  Good morning.  All right.  I just need to

 5     know -- I'm counting that there are seven people on the line.

 6     I only want to have identified the people who will be speaking

 7     for the plaintiff and for the defendant.  And we have a court

 8     reporter, so it is absolutely essential that before you say

 9     anything, that you state your name.  OK?

10              So, who is going to speak for the plaintiff?

11              MR. MARCUS:  Judge, it's Dave Marcus for the

12     plaintiff.  I will be speaking.

13              THE COURT:  OK.  And for --

14              MR. GRANTZ:  Good afternoon, your Honor.  This is

15     David Grantz from Meyner and Landis.  I will be speaking for

16     the defendant, but my partner, Catherine Kelly, is also on the

17     line, and she will also be addressing issues relating to

18     discovery.  I don't think there will be any confusion between

19     the two of us.

20              THE COURT:  OK.  Let me state, which I probably should

21     have for the record, that this conference call is being held in

22     the case of Stewart against Stewart, 19 Civ. 5960, and the

23     purpose of the call is to address a series of letters going

24     back to February 3rd and up into March.  March 24 I think may

25     be the last one.

K41dstec
                    Teleconference

1        So let's -- so the letters concern probably speaking

2    two topics.  One is the motion of -- or the proposed motion of

3    the plaintiff to the defendant's counterclaims and the second

4    general subject is discovery.

5        So let me say, on the topic of the motion to dismiss,

6    I think it is a total waste of time.  I think that the bottom

7    line here is that the parties need to learn by e-discovery the

8    universe of documents which exist or don't exist, and only then

9    with that universe of documents, will we know what can or

10   cannot be proven.  And I don't think that motions at this stage

11   will make any sense.  I think in the end, the documents,

12   probably combined with depositions which will explore whether

13   the documents are consistent with the positions that people are

14   taking, or have taken over the years, will be the answer.  I

15   don't think any motions at this time will be valuable.

16       Turning to the issues of discovery.  I think perhaps

17   one of the easier ones concerns the subpoena to Tres.  That's

18   T-r-e-s.  I have no problem if the parties wish -- or any party

19   wishes to try to compel a response to that subpoena.

20       There seems also to be an issue related to what search

21   terms were used, I believe, if I recall, by the plaintiff.  I

22   think that that's easy enough to deal with.  I think, if my

23   memory is correct on that, that the defendant is asserting that

24   plaintiff didn't utilize enough search terms.  The defendant

25   counsel can certainly tell the plaintiff's counsel what search

K41dstec
                          Teleconference

 1    terms the defendant used.  And I don't really know why it would

 2    be unduly burdensome for the plaintiff to run another search if

 3    there are additional terms that make sense for the plaintiff to

 4    utilize.  I don't think this issue of search terms ought to be

 5    a deal breaker.

 6           There's also an issue related to attorney-client

 7    privilege.  So, two things on that.  One, if there are

 8    documents which are being held on the basis of attorney-client

 9    privilege, I would like those documents to be submitted to me

10    with an explanation.  I will look at them and determine whether

11    it is an appropriate assertion of privilege.

12           Obviously, if you don't want to put them up on ECF,

13    the mails are still working.  Mail that is sent to the

14    courthouse will be forwarded to me at home, and I will be able

15    to look at it.  But I think there is perhaps a bigger issue

16    which I would like to hear from you about.  If I'm correct, the

17    privilege documents that are being withheld are between the

18    defendant and the attorney, a Mr. Iglehart.  Am I correct?

19           MS. KELLY:  Yes, your Honor.

20           THE COURT:  Well, I think Mr. Iglehart has a real

21    conflict problem, and I don't know that anything that he is

22    trying to resolve he can.  But if what I read is correct, at

23    one point Mr. Iglehart represented the plaintiff's husband and

24    the plaintiff.  I do not know how an attorney can now take on a

25    representation of the defendant which is contrary in this case

K41dstec
Teleconference

1    to the position of his former client, and I don't see,

2    therefore, why anything he is doing is privileged, because I'm

3    not sure he really could have even commenced an attorney-client

4    relationship with the defendant --

5              MS. KELLY:  Your Honor --

6              THE COURT:  -- certainly to be accepted to the

7    contrary to the plaintiff --

8              MS. KELLY:  Your Honor, at the time that Iglehart

9    represented defendant -- and I apologize, your Honor.  This is

10   Catherine Kelly, on behalf of the defendant.  There are two

11   documents that are on our privilege log that are being

12   withheld.  The first one is dated from 2010 and the second is

13   2009.  At that time, I'm not sure whether a conflict would have

14   existed between the parties, but we can brief that issue for

15   your Honor, if the Court would like.

16             THE COURT:  I just think it's, you know, kind of a

17   problem.  You know, there is no question that the defendant and

18   the plaintiff have a conflict, and there also appears to be no

19   question that the attorney represented the plaintiff at one

20   point and is now representing the defendant.

21             MR. GRANTZ:  This is David Grantz.  I understand --

22   for the defendant.  I understand the issue that you are raising

23   about conflicts, and I do think we need to dig in a little bit

24   further.  You mentioned it in our first conference, when we

25   were there in person, that you had some concerns about

K41dstec
                                Teleconference

1    Mr. Iglehart's representation.

2              My understanding is that he was representing

3    Mr. Stewart and Mrs. Stewart in the '90s and then going forward

4    sometime into the 2000s and maybe later.  At some point in the

5    relationship, the attorney started to represent the defendant

6    in the context of the issues that were being done with respect

7    to this jewelry and the relationship between the defendant and

8    the entities that were formed to hold the jewelry, so at the

9    time there would not have been any conflict of interest between

10   the plaintiff and the defendant.

11             THE COURT:  Why?

12             MR. GRANTZ:  Who are adverse to each other --

13             THE COURT:  The position --

14             (Teleconference computer beeping)

15             THE COURT:  Hello.  Have we lost anybody?

16             MR. GRANTZ:  You didn't lose me.  This is Mr. Grant.

17             THE COURT:  Mr. Marcus, do I have you?

18             MR. MARCUS:  Dave Marcus, still here.

19             THE COURT:  OK.  Ms. Kelly.

20             MS. KELLY:  Yes, I'm still here.  Thank you.

21             THE COURT:  The court reporter, who at the moment is

22   nameless to me?

23             THE COURT REPORTER:  I'm sorry, your Honor.  This is

24   Vincent Bologna.

25             THE COURT:  Hi, Vincent.  How are you?

K41dstec
                    Teleconference

 1          THE COURT REPORTER:  OK.

 2          (Discussion off the record)

 3          THE COURT:  Let's go back.

 4          Mr. Grantz, why don't you repeat what you said because

 5     I probably interrupted you.

 6          MR. GRANTZ:  So, there was no interruption, Judge.

 7     The issue that I'm raising is that at the time that we're

 8     talking about in 2009 and 2010, the representation was not a

 9     circumstance where the plaintiff and defendant were adverse to

10     each other.  They were working, you know, in tandem

11     essentially.  Ms. Stewart and her husband had delivered the

12     jewelry to Topaze, which was formed in the '90s and changed to

13     DGBF, and they designated her as the beneficial owner of the

14     company.  And she was involved with Mr. Iglehart entering into

15     a fiduciary agreement so that he could serve the entity, and he

16     represented her in that capacity and other capacities as well.

17     But at the time there would not have been any conflict between

18     his dual representation of Ms. Stewart in the context of her

19     delivering jewelry to this entity and the beneficial owner.

20     Sorry.

21          THE COURT:  I'm sorry.  When you say "Ms. Stewart,"

22     why don't we say the plaintiff and the defendant, since they

23     both have the same name here.

24          MR. GRANTZ:  Sure.  I refer to my client as

25     Ms. Bouman.

K41dstec
                          Teleconference

1          THE COURT:  All right.  Fair enough.

2          MR. GRANTZ:  I apologize.  I don't want to talk over

3     you.

4          THE COURT:  Go ahead.

5          MR. GRANTZ:  No, that's it.  I respectfully disagree

6     that there would have been a conflict of interest for

7     Mr. Iglehart back in 2009 and 2010.  And to the extent that

8     they are withholding documents based on privilege during that

9     time, I don't agree that he would have had a conflict then.  To

10    the extent he was representing Michele Bouman in the context of

11    something against Mrs. Stewart now or within the last few

12    years, then, yes, but that's not what we're raising.

13         THE COURT:  All right.  But back in 2009, or leaving

14    aside the time, you're saying that there was no conflict, but

15    does that mean that your client at that time agrees with the

16    position of the plaintiff here that that jewelry was put into

17    the Topaze entity to avoid taxes on the plaintiff and was being

18    held by the entity essentially in trust for the plaintiff's

19    granddaughters?

20         MR. GRANTZ:  I think that there is no disagreement

21    about that up until a certain point.  I think that that's an

22    accurate statement up until I believe 2007, at which point

23    there was a change in the relationship, and Ms. Stewart and all

24    of the people involved in this determined that Michele should

25    be the beneficial owner of the jewelry and when Michele died

K41dstec
                    Teleconference

 1  she should have it passed along to the children.  So, yeah, I

 2  think that there are distinctions to be made, but I don't

 3  disagree that the jewelry was placed into Topaze sometime in

 4  the beginning of the '90s and continually thereafter for this

 5  purpose, but I don't know if I want to use the word "trust"

 6  since there was never a formal trust created and no writing

 7  associating anyone to a trust.

 8          THE COURT:  And what document in 2007 says that the

 9  plaintiffs in this case said instead of retaining my sort of

10  life interest in this jewelry, I would like to give all of this

11  jewelry to my ex-daughter-in-law?

12          MR. GRANTZ:  So, Judge --

13          THE COURT:  Or maybe then daughter-in-law.  I don't

14  have all the marital details in my brain.

15          MR. GRANTZ:  I don't have every document in front of

16  me that could answer that question and I don't think you do,

17  either, because we didn't submit all of that.  But I can tell

18  you that I am looking at a couple of documents in front of me

19  right now, one of which is a 2009 document in which Ms. Stewart

20  wrote a letter to Mr. Iglehart, and it was faxed on November 9,

21  20 -- excuse me, November 6, 2009.  And it says: "John, I,

22  Barbara Stewart, hereby direct you to consider Michele Bouman

23  beneficial owner of DGBF Holdings, Ltd.  This letter is to

24  reiterate what I have said to you verbally in the past, that

25  is, that Michele Bouman be considered as sole beneficiary owner

K41dstec
                    Teleconference

1   of all shares and assets of DGBF Holdings.  Best regards,"

2   signed by Ms. Stewart.

3              And I have an email that precedes that by a few

4   months, and I believe it is sent on September 10, 2009.  But to

5   be honest, Judge, sometimes these emails have the dates a

6   little flipped because some are being sent from Europe and some

7   are being sent from the U.S.  So this one says Thursday, 9/10

8   2009, so I am assuming it is September 10, 2009 and not

9   October 9th.  It says, "Michele, a request has been made by

10  Bill's counsel for all financial documents relating to Topaze,

11  Ltd.  You are the beneficial owner of the company.  I have no

12  ownership interest in the company.  My counsel has explained

13  that to the Court in New York.  Nevertheless, the Court has

14  directed the documents relating to Topaze be produced.  Since I

15  am not the owner, I cannot direct anyone to turn over the

16  documents.  Either you can provide them to me so that I may

17  comply with the Court's directives or you should instruct John

18  Iglehart to produce the documents that have been requested.

19  Either way, the documents need to be forwarded to me."

20             So this is in 2009.  Then in 2007 there was a

21  fiduciary agreement that was prepared by Mr. Iglehart in which

22  he was declared the fiduciary for the entity and Ms. Bouman was

23  the beneficial owner, and she signed the fiduciary agreement

24  with Mr. Iglehart.  So -- and you kind of put me on the spot as

25  to what document.  There are a lot of documents.  But I can

K41dstec
                        Teleconference

1    tell you about those right off the top of my head.

2              THE COURT:  And, you know, we would all agree that at

3    no time -- or would we all agree at no time was the plaintiff

4    ever a beneficial owner of the shares of Topaze or the

5    successor entity or --

6              MR. GRANTZ:  There is no --

7              THE COURT:     -- is that correct?

8              MR. GRANTZ:  There's no evidence to suggest that, and

9    all of the testimony in the prior proceedings, in the trust

10   action and the divorce action, that we've seen have suggested

11   that she was never the beneficial owner and never intended to

12   be the beneficial owner and that the jewelry was intended to be

13   out of her name so that I presume she could avoid tax

14   liability.

15             MR. MARCUS:  Judge, this is Dave Marcus here.

16             I mean, I would respectfully disagree.  I mean, the

17   documents, if we get into the weeds, they are certainly

18   inconsistent.  There are documents showing -- as early as 1996,

19   there is a document from Iglehart to Michele which says that

20   Bill Stewart is going to continue to determine what happens

21   with the jewelry with instruction from him.  There was an

22   understanding that the jewelry be put in this company Topaze,

23   but there is -- there is no -- I mean, I'm not sure what

24   "beneficial owner" means, to begin with, and I think that term

25   can be a little bit flexible.  But certainly I think Barbara

K41dstec
                         Teleconference

1    Stewart understood that the jewelry was going to be put in a

2    company, Topaze.  Whether she had an ownership interest in

3    Topaze or not, she understood and I think all the parties

4    understood that she continued to hold some of the jewelry and

5    that she would have use of it.

6              I don't think she understood the legalities of it.

7    This was all done by Iglehart and set up by Bill Stewart.  I

8    think everybody agrees to that, that that case, that it was

9    done as sort of a tax shelter.  But the fact that a letter --

10   the letter that Mr. Grantz is referring to in 2009 appears to

11   have been written by Mr. Iglehart as a witnessed by line and at

12   the same time he is writing a letter saying why don't you sign

13   this saying that Michele Stewart is the beneficial owner, and

14   he is supposedly representing Michele Stewart.  And it appears

15   from other documents that they are having a relationship at the

16   time, and this is where the conflict I think that you -- that

17   you referenced earlier comes in.

18             There is no clarity to who was the beneficial owner.

19   We don't know who owned Topaze, and there is no documents which

20   indicate who the owner of that company was.  But there are

21   documents suggesting that it continued to be controlled by

22   Barbara and Bill Stewart because they were taking directions

23   from Barbara and Bill Stewart.  So to say that they had no

24   interest in it, I don't think we can -- we certainly haven't

25   come to that determination.

K41dstec
                    Teleconference

1           And the burden is on the defendant here, who is

2    claiming that she has taken ownership of a company that there

3    is no corporate documents ever showing that any delivery of

4    jewelry was made to a company, that the company -- what Michele

5    Stewart's -- Bouman's interest in the company was, or how it

6    was ever transferred to her.  There is no evidence of this.

7           And that's why, Judge, if I can take a step backwards,

8    I think it's so important to have this motion on the

9    counterclaim heard, not so much because that needs to be --

10   that issue needs to be decided now, but because the scope of

11   discovery will be so expansive.  What they're seeking is -- as

12   opposed to seeking documents showing the company ownership, who

13   had an interest in the company, how the company got

14   transferred, those are the critical documents in this case --

15   they want all -- they want to go through -- they want us to

16   look at every email that Barbara Stewart ever sent to any

17   member of her family.  And there are over 30/40 years and there

18   are thousands of them, tens of thousands maybe.  And for us to

19   go through all of those for no purpose at all, to find where

20   maybe Barbara Stewart said to one of her sons, oh, you know,

21   I'm wearing this piece of jewelry for -- I have a function or

22   what have you, I don't see a purpose of it.

23           I think that the motion -- I'm sorry, did you want to

24   say something?

25           THE COURT:  I don't think I follow why this motion

K41dstec
                    Teleconference

1   will accomplish anything.  I think that's what I said at the

2   outset.

3            MR. MARCUS:  OK.

4            THE COURT:  Is you really -- in the end, one of you is

5   going to be able to prove your side, and only one of you, or

6   maybe nobody, but you don't get -- let me phrase it another

7   way.  If you were making a motion for summary judgment, this

8   would be an ideal textbook case where the other side would say,

9   Judge, we can't respond to this motion for summary judgment

10  without additional discovery.  It seems to me this is

11  essentially the same position that we're in now.

12           MR. MARCUS:  May I respond, Judge?

13           THE COURT:  Sure.

14           MR. MARCUS:  Yeah.  I would respectfully disagree with

15  that because we have here there is -- based on the pleadings,

16  based on the pleadings alone and the counterclaim, the

17  counterclaim cannot stand.  It must fall, and it falls under

18  its own weight.  And they're saying here -- I mean, to show

19  that there was a gift, they're saying that there were two gifts

20  that were made.  One is that all the jewelry -- all of

21  Barbara's jewelry was gifted to Topaze, number one.  Secondly,

22  that the company, Topaze, or its successor DGBF, whatever, was

23  gifted to Michele Stewart.  In order to show that, there must

24  be facts alleged -- they must show that there are corporate

25  records, there are corporate documents, there was a delivery of

K41dstec
Teleconference

1    jewelry, there was an intent to make a gift, that was a gift.

2    It must be established that there was an intent to make a gift

3    at that time, present intention, and that you can't reserve any

4    of the gift to yourself, or you can't make it for a future

5    time.  And what they're saying is, well, she wasn't really

6    putting it in, it was a tax shelter; she wasn't looking to make

7    a gift, she was looking to shelter it.  And there is no

8    evidence -- there is no pleading that there was -- specific

9    factual pleading of any delivery of the jewelry.  There was no

10   pleading that the company was -- or who it was owned by, who

11   Topaze was owned by.  She might have put it in Topaze and she

12   owned Topaze.  We don't even --

13            THE COURT:  I'm sorry.  Documents were submitted,

14   which I actually read very recently, under cover of letter of

15   February 26, which are records about Topaze, and at least for a

16   period of time, it shows who were the owners, who had the

17   stock, what the assets of Topaze were.  I'm not --

18            MR. MARCUS:  If I may --

19            THE COURT:  -- on what that all means.  But to say

20   that there is no record of sort of the history, to some extent,

21   of Topaze is not quite accurate, I think.

22            MR. MARCUS:  Well, I think it is accurate.  I think

23   what you're referring to are documents which indicate that John

24   Iglehart was the owner of --

25            THE COURT:  I agree with you.  999 out of a thousand

K41dstec
Teleconference

1    or 99 out of a hundred in somebody else's name, who I don't

2    know.

3              MR. MARCUS:  So if John Iglehart files a document and

4    says I'm the owner of this company, I mean, there has to be --

5    there has to be a document from Barbara and/or Bill Stewart

6    saying we are transferring this property.  John Iglehart never

7    said he was an owner of any of this.  It was never -- he was a

8    person who was, just for purposes of appearances, I guess, he

9    was the -- he put himself in as a beneficial owner, as a

10   shareholder, but he's never claimed that he had any ownership

11   in this.  There was no claim in this case by anyone.  I mean,

12   this appears to have been some type of -- all I can -- and this

13   is -- you know, what I surmise from it, that was some type of

14   tax shelter which was done for purposes of keeping Bill Stewart

15   and mainly Barbara Stewart's name out of the documents to avoid

16   a, you know, exactly what they said, avoid wealth tax or avoid

17   some inheritance tax, what have you.  And so it was put -- John

18   Iglehart was listed as a director.  He put himself in as a

19   shareholder.  There has to be some other agreement between

20   Iglehart and whether it is Bill Stewart or Barbara Stewart that

21   details what this company was all about.  But it has nothing to

22   do with Michele Stewart, and Michele Stewart hasn't evenly pled

23   that it was John Iglehart that was the owner of the company.

24   And if that's the case, why is Iglehart continually writing

25   Barbara and Bill Stewart saying, you know, sign these, you

K41dstec
                              Teleconference

 1    know, saying that it was -- you know, show beneficial owner?

 2    And then why aren't they responding at the time when Barbara

 3    (unintelligible), she says, hey, I thought I put all this

 4    jewelry in Topaze, can you just please confirm that for me so

 5    that I could tell the marital court?  And when the marital

 6    court was not informed, because they said -- Michele said I

 7    don't have any information.  Iglehart, they didn't respond, or

 8    they said they didn't have it.  And then Barbara was found to

 9    be not credible at the hearing.  And she was attributed with --

10    all this jewelry was attributed to our side of the balance

11    sheet, and so she got -- she ends up with virtually nothing.

12            THE COURT:  I get that.  But the point is just

13    listening to you makes my point, my point being that there

14    isn't a clear record.  The fact may be that there never will be

15    a clear record, I don't know.  But I think we ought to get to

16    the point where each side has to say that's all I can produce

17    to support my side.  And once we've reached that point, we'll

18    then see if either party can actually get over the 50 percent

19    part.

20            But I do think -- and I raised it and everything you

21    are saying raises more questions about Mr. Iglehart with me.

22    But I do want to point out to you that if you would look at

23    there are Irish documents that in April of 1994 Michele Bouman

24    becomes a director, but, guess what, she is not listed as a

25    director by 1997.  I don't know what's going on, but, frankly,

K41dstec
                        Teleconference

 1  neither do you.  And until I have a better sense of what is

 2  going on, I am not about to sort of come down on the side of

 3  either party when there is much left to be discovered.  Maybe

 4  it will never be discovered.  I don't know.  Because maybe some

 5  of this stuff is in Switzerland and Mr. Iglehart has destroyed

 6  documents.  We don't know whether he has or not, and maybe we

 7  need to have some lawyers from abroad give us an education in

 8  this -- what Topaze really is and what it can be and how this

 9  stuff works there.  I don't know.

10          But I go back to what I said to you at the very outset

11  the first time I met you:  You should settle this case.  No one

12  is getting younger.  And there are rational ways to work

13  through this.  But, you know, that is up to you.  I think

14  we've --

15          MR. MARCUS:  Judge.

16          THE COURT:  Yes.

17          MR. MARCUS:  If I may?  To the extent that --

18          THE COURT:  Identify yourself.  Sir, identify

19  yourself.

20          MR. MARCUS:  I'm sorry.  Dave Marcus for the

21  plaintiff.

22          To the extent -- I understand what you're saying.  But

23  then, at the very least, I think discovery should be limited to

24  the issues that you are referencing.  Because what's happening

25  here is the defendant is only interested in discovery that goes

K41dstec
                         Teleconference

1   into the, you know, our conversations in which they seem to

2   only be interested in issues of jewelry with regard to what

3   Barbara talked to Tres about or what Barbara talked to her sons

4   or Bill, and we would have had to go through so many years of

5   her emails, go through every single -- I mean, you could only

6   imagine how many emails were sent to family members and every

7   email that uses the word rock or ring or whatever it was, they

8   had a whole list of emails.  And it would be such a gargantuan

9   task for us to go through that and sort through it.

10              We've produced everything --

11              THE COURT:  Excuse me.  Let me interrupt you.

12              Can't that be done by a service where, you know, like

13  that you give search terms?  It is not that you sit and read

14  them.  It is that the stuff gets loaded into, you know, some

15  computer with search terms, and then, you know, the documents

16  which have those search terms pop up and then you read them?

17              MR. MARCUS:  Right.  But even though I'm saying --

18              THE COURT:  Let me interrupt here.  Why can't you

19  afford to do that?

20              MR. MARCUS:  Because our resources are very limited in

21  this case.  I mean, it's just -- if it were something that

22  would produce anything that had anything to do with Topaze, the

23  ownership of Topaze, the transfer of Topaze, we have produced

24  all of that.  All of that has been produced.  We produced

25  everything.  I think they've produced everything, and they've

K41dstec
                          Teleconference

1    said they produced everything in that regard.  But to go off on

2    discovery on issues that would really reflect damages in the

3    event that they were successful on their counterclaim and say,

4    well, OK, you know, do you still have this piece or that piece,

5    or what did you do with jewelry when you were 40 years old or

6    30 years old, or to go back into all that is just -- it expands

7    the scope of discovery tenfold.  And it's not limited to the

8    issues that are essential to determination of the liability of

9    this case, the liability of the parties.  And so it puts a

10   tremendous burden on us to respond to discovery, which I don't

11   think is part of any of this discussion that we're having here.

12   I don't -- you know, I would respectfully disagree that I think

13   the motion -- I think the motion speaks for itself.  I think

14   they can't plead it.  They haven't pled it.  They can't plead a

15   counterclaim, and that would narrow the scope of discovery

16   substantially.

17          But to the extent that your Honor believes that we

18   should do discovery that will flesh those issues out, then I

19   think discovery, at least in the initial stages, ought to be

20   limited so that we can make those findings.  And then if

21   they're successful on their motion, or if we lose the motion,

22   and, you know, at some point in time, OK, then maybe you get

23   into other issues.  But it would be certainly in plaintiff's

24   interest if discovery could be narrow at this point.  But if

25   the Court is not going to rule on our motion to dismiss the

K41dstec
Teleconference

1    counterclaim, let's at least narrow the discovery to the issues

2    that would flesh the answers to that out.

3           MS. KELLY:  Your Honor, this is Catherine Kelly.  May

4    I respond to that?

5           THE COURT:  Sure.  Of course.

6           MS. KELLY:  Your Honor, this is a case of the

7    plaintiff just trying not to fulfill her obligations in federal

8    court.  I mean, plaintiff filed this suit.  We filed

9    counterclaims.  We conducted an exhaustive search for

10   documents, hardcopy and electronic.  We produced all of those

11   documents, including documents that we withdrew from

12   Mr. Iglehart's file.  We also conducted a search of the Irish

13   documents that your Honor was referring to that have been

14   publicly available since the time they were filed.  And since

15   that time, we have also produced documents that we found from

16   the British Virgin Islands, which we also produced to the

17   plaintiffs.  They were also publicly available since the time

18   they were filed.

19          The plaintiffs have not -- they are just making

20   conclusory statements about their burden.  This case has not

21   been bifurcated.  All of our requests are relevant.  They have

22   not argued otherwise.  They have not conducted any preliminary

23   searches to determine that the number of hits is overly

24   burdensome.  They haven't provided the Court with any estimates

25   of how long the review would take and to establish that it's

K41dstec
                        Teleconference

1    just too long.  They just don't want to do the work.  They

2    don't want to spend the money.

3            So, your Honor, there is absolutely no basis to their

4    argument.  We have provided them with our exhaustive list of

5    search terms, which they refused to do.  Then we said, OK,

6    fine, we'll give you a slimmed down list of search terms to

7    conduct.  They refused to do that.  They refused to give us a

8    list of the search terms that they did use, and they refused to

9    give us a search -- a list of search terms that they propose to

10   use.  They just don't want to do it.

11           It's not -- that is not what the rules obligate the

12   parties to do in federal court.

13           I'm sorry.  Just to follow up.  We have identified

14   areas in which plaintiff's production is deficient.  For

15   example, your Honor, we sought all communications between

16   plaintiff and anybody else regarding her jewelry.  She only

17   produced three pages of documents.  I mean, as we have been

18   discussing, she established this company as a tax shelter 28

19   years ago.  Topaze owned 80 pieces of jewelry that were for a

20   purchase price of $80 million.

21           THE COURT:  What document shows that?  What document

22   shows that -- ever -- that jewelry worth $80 million was

23   deposited, in a sense, into Topaze and became the property of

24   Topaze, at least for some period of time?

25           MR. GRANTZ:  Your Honor, this is Dave Grantz speaking.

K41dstec
                              Teleconference

1          Just briefly.  I think Catherine misspoke slightly

2   about $80 million.  I think the number isn't 80 million.  So

3   why don't we just clarify the record on that?  I think the

4   jewelry that has been placed in there is closer to 8 to $10

5   million, not 80 million.  So that was the first comment.

6          Then the second is we don't have a lot of documents

7   from 28 years ago because this was 28 years ago, and, you know,

8   the difficulty in obtaining documentation that goes back that

9   far is just the nature of age.  And when we inquired of

10  Mr. Iglehart, his comment to us is he has a ten-year retention

11  requirement in Switzerland.  So we may or may not --

12         THE COURT:  Let me interrupt right on that.  That is

13  not an answer, that there is a mandatory ten-year retention

14  statute.  Has he ever sworn in a piece of paper that he

15  destroyed documents, even though he had a continuing client

16  relationship that continued well after ten years involving

17  these exact same entities?  I don't think lawyers go off and

18  destroy old documents when they have continuing client

19  relationships on a subject matter.  So, I'm not so sure that I

20  buy his excuse for not providing documents.  Maybe it is that

21  he is now aligned with the defendant and doesn't want to

22  produce the earlier documents.  I don't know.  But I am very

23  suspicious about this.  You can tell that from --

24         MR. GRANTZ:  I appreciate it.  This is Dave Grantz

25  again.  I appreciate the suspicion.

K41dstec
Teleconference

1    So a couple of comment about that.  So this

2    information that Ms. Stewart has been seeking for many, many

3    years to establish her position in the divorce case is

4    troublesome, because she never went to Switzerland at that time

5    and sought a subpoena of Mr. Iglehart and never did anything to

6    enforce her rights as the client of Mr. Iglehart to get -- to

7    gain these documents.  It was only after the divorce case when

8    she took issue with Ms. Bouman and Mr. Iglehart.  Never once

9    did she do anything from a legal standpoint to obtain the

10   documents.  And that's even borne out more by the fact that we

11   just found publicly-available records, records that were

12   available since the '90s and the early 2000s, and we produced

13   them by purchasing them for a few dollars on the Internet.

14   Those records were there.  They were there when she was in her

15   divorce case.  Her attorney didn't seek them.  They didn't

16   present them.

17       And Mr. Marcus' conclusions that her credibility on

18   this issue was implicated by Michele Bouman or Mr. Iglehart

19   refusing to provide documentation to her is just simply absurd.

20   I mean, her credibility is damaged by so many other problems,

21   and for that reason we're looking for the divorce record.  And

22   the reason why we're looking for these other records is because

23   we believe that there are multiple admissions.

24       I mean, Mr. Marcus doesn't want to do these searches

25   and provide us with correspondence between Ms. Stewart, her

K41dstec
                        Teleconference

family members, because he knows that she says things in emails

that are going to be problematic, and we want to see what those

things are.  It is a reasonable request.  Admissions against

interest are going to be particularly helpful in this case to

us.

        I wanted to get back to one other comment you made

earlier, Judge.  You said that it is going to be a problem,

potentially, for one or the other side or maybe both sides to

prove the case.  And you're absolutely right.  The case is rife

with evidential problems, because the records are old, the

information is in Switzerland.  The way to obtain it would be

through the Hague Convention subpoena, but neither party wants

to go through that process --

        THE COURT:  Why?

        MR. GRANTZ:  -- because it is expensive and uncertain.

And so everyone seems to let Mr. Iglehart off the hook.

        And then, to your last comment, this case should be

settled.  There is absolutely no reason for this case to

continue.  We've made a settlement proposal.  Got no response.

We'd like to have an opportunity to go through either a

mediation or an alternative dispute solution, because this case

cries out for settlement.  I mean, the parties each have a

portion of the jewelry in their possession.  It just doesn't

make sense to spend all of this money litigating when we could

resolve it but we just don't seem to have a partner in that

K41dstec
Teleconference

1   resolution.

2          MR. MARCUS:  If I may, Judge?  Dave Marcus for the

3   plaintiff.

4          I think a settlement proposal of withdrawal of the

5   lawsuit is not a settlement proposal.

6          Secondly, with regard to the divorce record, it is

7   simply not true.  I spent -- we had three conference calls with

8   Ms. Kelly.  We spent -- we initiated them and had spent an

9   enormous amount of time talking about it.  She insisted on

10  getting the entire divorce record.  She wanted the transcripts

11  and the exhibits.  There are 6,000 or so pages of it.  At the

12  conclusion, I think it was the third time that we spoke with

13  her, we pressed her and said, you appear to have all this stuff

14  because you have been citing it.  And she said -- and she then

15  acknowledged, yes, we do, we have all of it.  So after all of

16  that --

17         MR. GRANTZ:  That is not true.

18         MR. MARCUS:  That is.  She said you have it.  And I

19  confirmed that in a letter.  I don't.

20         (Unintelligible)

21         THE COURT:  Stop.  Stop.

22         I've read your letters.  There is not an admission by

23  defendants that they have everything from the divorce

24  proceeding.  They acknowledge -- I don't recall the specifics,

25  but they have some of it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K41dstec
                      Teleconference

 1            I agree with you, if they have it, they shouldn't be

 2    asking you for it again.

 3            Look, guys, if you are not prepared to spend the money

 4    to prosecute your case, to learn everything that is learnable,

 5    then the answer is you settle.  That is rational.  But you

 6    can't not do what needs to be done and then somehow say, Judge,

 7    you figure it out but we're not going to tell the Court all the

 8    information that would be the basis for an accurate decision.

 9    I don't -- I want to get it right, and it is your job to

10    present the actual evidence to me.  And if you don't want to

11    spend the money on a Hague Convention subpoena, then somebody

12    is going to live with a determination that you haven't gotten

13    past the 50 percent point.

14            MR. MARCUS:  With regard, Judge, to Iglehart, that --

15    it's not accurate when Mr. Grantz says that nobody tried to get

16    that.  Mr. Iglehart was sued in Switzerland by Swiss lawyers

17    who went after his file.  It was brought -- it was before the

18    equivalent of the Bar Association there.  And his files -- and

19    they are well aware of this because I did explain this to Ms.

20    Kelly in great detail on the phone with her that his files were

21    ultimately, after extensive, I think, litigation -- I wasn't

22    involved in that.  I was (unintelligible).  It was a difficult

23    process.  He produced his files to Swiss counsel, who produced

24    them to me.  We reviewed them in their entirety and produced

25    anything relevant to defense counsel.

K41dstec
                        Teleconference

1           There was --

2           THE COURT:  Excuse me.  You have more of his files

3   that --

4           MR. MARCUS:  I have, it is just financial stuff.  It

5   is bank records.  It is other stuff.  It has nothing to do

6   with -- but anything that was -- that had anything to do with

7   the jewelry were produced -- was produced.  There were --

8           THE COURT:  Hold on.  Have you produced every single

9   paper from Mr. Iglehart's files about Topaze and the successor

10  entity?  Every single paper?  Yes or no?

11          MR. MARCUS:  Every single -- yes.  Yes.  Definitively

12  yes.

13          There was only one piece -- I would have to go back

14  and confirm that, but I believe there was only one piece of

15  paper that had anything to do with Topaze in his file.

16  Everything else was just -- it was hundreds and hundreds of

17  pages of bank -- I think he was power of attorney for

18  Ms. Stewart, and so he was keeping bank deposits and what have

19  you.  I have no problem producing the whole file but --

20          THE COURT:  And how are you so sure?

21          MR. MARCUS:  So sure?

22          THE COURT:  If he had power of attorney for the

23  plaintiff, again, how does he go represent the defendant?  But

24  that's OK; assume just another part of my suspicion here.  But

25  when he is exercising this power of attorney, how are you so

K41dstec
                         Teleconference

1   sure that he has nothing to do with the underlying facts of

2   this case?

3         MR. MARCUS:  My recollection -- I don't have it in

4   front of me.  My recollection is just simply bank records from

5   Swiss -- from Swiss -- most of it.  I have no problem producing

6   the whole -- I'll produce the whole Iglehart file.  I would

7   imagine I have no -- I have no qualms about that.  It is just I

8   wasn't going to just do a document dump if there is nothing in

9   there.

10        I went through the entire file.  I searched.  I went

11  through it personally.  And I produced -- there was the one

12  letter I believe that we did produce that was a letter from him

13  to Michele.  That was the one with the eleven kisses, X's and

14  O's, that was produced.  I believe it was a 2012, if I'm not

15  mistaken.  But other than that, there was nothing -- there was

16  nothing on Topaze, there was nothing on DGBF, there was nothing

17  at all in his file that he produced to Swiss counsel that had

18  anything to do with any of the issues in this case.  There was

19  simply a bank transaction and other stuff that he had -- he had

20  represented Barbara Stewart for many, many years and whatever

21  it was he had.  Again, I don't have it in front of me, but it

22  was nothing that had any relevance that they would be

23  interested in going through, so I did not produce the whole

24  file.

25        But I did tell them that I did have that file.  I

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

K41dstec
                          Teleconference

 1   imagine maybe they have the file as well.  But I don't know

 2   what they got from Mr. Iglehart.  They got apparently other

 3   information, other documents from Mr. Iglehart that we did not

 4   have, that were not in the file that he produced to us.

 5            MR. GRANTZ:  This is Dave Grantz, Judge.

 6            Whatever documents we got from Mr. Iglehart, we

 7   produced.  We have no other files.  We have no other

 8   information.  The information that he is talking about now

 9   related to a proceeding that came after the divorce, I guess

10   when Ms. Stewart was frustrated with the result of her divorce

11   and wanted to gather documentation and prosecute Mr. Iglehart

12   criminally for his conduct, and she also brought a proceeding

13   against Ms. Bouman in Switzerland criminally for her conduct as

14   related to the divorce.  I don't know what happened in

15   Mr. Iglehart's proceeding.  In Ms. Bouman's proceeding, the

16   case was dismissed and she was told to pursue Ms. Bouman

17   civilly.

18            We would like to see any documentation that Mr. Marcus

19   has obtained from Mr. Iglehart, and we'll make our own

20   determination as to whether or not something is or isn't

21   relevant or is pertinent to the matters of this case, and we

22   would appreciate that he does produce those things to us.

23            MS. KELLY:  Your Honor, also -- this is Catherine

24   Kelly.  If I may just briefly discuss the divorce issue, which

25   Mr. Marcus raised a couple of minutes ago?

K41dstec
Teleconference

1        I am not sure the chronology laid out was accurate.

2   But what we are requesting, your Honor, are the deposition

3   transcripts, the pleadings, motions, and other documents filed

4   with the divorce court, and plaintiff's discovery responses.

5   Plaintiff has objected, saying that those documents are not

6   relevant and overly burdensome.  But, I mean, as we've been

7   discussing, those documents are clearly relevant, because in

8   that proceeding the plaintiff repeatedly disclaimed any

9   interest in the jewelry and testified to this fact multiple

10  times under oath, claiming that she transferred all the jewelry

11  to Topaze and that Michele owned Topaze.  Of course, we now --

12  we know that she is arguing the exact opposite here, and that's

13  why we want those documents.

14       We subpoenaed plaintiff's ex-husband for these same

15  documents, and he told us that he is willing to produce them to

16  us if plaintiff gives consent.

17       THE COURT:  OK.  That's the end of it.  So long as the

18  two parties to the matrimonial agree that the matrimonial

19  record can be produced to third parties, they are available.

20  The law is otherwise that normally it is only the husband and

21  the wife, or the two, you know, who have access to the

22  testimonial proceeding.  But if there is no objection on the

23  part of the husband, then we're just into a regular discovery

24  dispute.

25       MR. GRANTZ:  Your Honor, this is Dave Grantz.  Sorry

K41dstec
                            Teleconference

1    to interrupt.

2            I agree with you completely on that point.  The

3    problem is that we don't have consent from Ms. Stewart to get

4    those records from Mr. Stewart.

5            THE COURT:  She doesn't --

6            MR. GRANTZ:  She doesn't consent.

7            THE COURT:  Wait a minute.  She doesn't want to -- the

8    plaintiff is resisting producing them in this case, but that

9    isn't the same thing as getting permission from the husband.

10   If the husband gives you permission, gives the defendant a

11   letter that says I have no objection to the records of my

12   matrimonial proceeding with my former wife being produced in

13   the context of this litigation, what else do you need?

14           MR. GRANTZ:  Well, he's given us that letter.  She

15   won't produce the records, or she won't consent to have him

16   give them to us.  She is the one holding us up, not him.

17           THE COURT:  I got that.

18           MR. GRANTZ:  So all we need to do is have her consent

19   and he'll give us all the records.

20           Are you ordering her to consent?

21           THE COURT:  Mr. Marcus, why shouldn't, if there is no

22   burden and your position is they are irrelevant, so, you know,

23   produce or not, that doesn't make them relevant.  If they are

24   not relevant, they will remain not relevant.  So what possible

25   objection can you have?  No burden on you because you don't

K41dstec
                            Teleconference

 1   have to be the one producing them.  Relevance is ultimately

 2   determined by me, not you.  End of story.

 3                MR. MARCUS:  Right.

 4                THE COURT:  Right?

 5                MR. MARCUS:  I suppose I don't have any strong

 6   objection.  I was --

 7                THE COURT:  OK.  Done.

 8                MR. MARCUS:  -- certainly (unintelligible) --

 9                THE COURT:  Done.

10                MR. MARCUS:  Go ahead.  You can get them from

11   Mr. Stewart.

12                THE COURT:  OK.

13                MR. MARCUS:  You could say I don't object.

14                Now, my understanding is you have the record --

15                THE COURT:  I don't care anymore.  Let them have it.

16   They can get it direct from Mr. Stewart.  Excellent.

17                MR. MARCUS:  OK.

18                THE COURT:  All right.  So we've now covered the Tres

19   subpoena.  We've covered the attorney-client privilege issue,

20   which I would expect some submissions on from the defendant,

21   and, of course, plaintiff can respond.  I think that we have

22   some issues about search terms.

23                And I guess the answer, Mr. Marcus, since you brought

24   the case, is you want to make a submission about the cost and

25   burden of doing the search that the defendants want you to do.

K41dstec
                          Teleconference

 1   You really need to do that with, you know, real expert

 2   testimony.  You need to have one of these companies say for us

 3   to work through this amount of records, it will cost the

 4   plaintiff, you know, five dollars.  Since you can't just say

 5   it, you just can't say it.  That is not sufficient.

 6            MR. MARCUS:  Well, our main point -- this is Dave

 7   Marcus speaking for the plaintiff.  Our main point, Judge, is

 8   it doesn't go to any of these other issues, and it is just

 9   burdensome, it is irrelevant, to have us go through every email

10   that Barbara sent to any one of her children --

11            THE COURT:  How about sent emails talking about your

12   jewelry?  I mean, give me a break.  Seriously?

13            MR. MARCUS:  It is not just jewelry, but if you look

14   at the list of words that they have in there, it's an enormous

15   list.  It would pop up -- it would pop up many, many, many

16   emails, and it is just -- it is not going to -- you know.  I

17   mean, I could tell you I spent about two weeks going through

18   documents.  We have many, many documents in this case,

19   documents I spent an enormous amount of time and enormous

20   detailed effort to go through and pull up everything that we

21   thought was relevant in this case to the issues that dealt with

22   any of the issues in this case.  And we had conferenced with

23   defense counsel prior to discovery, and we talked about search

24   terms.  And we agreed to, you know, let's make our demands and

25   then we'll respond accordingly and that we didn't need to sit

K41dstec
Teleconference

and identify specific search terms from the getgo.  We had that

initial conference.

And then now they come back and say, well, you didn't

produce enough documents and, therefore, go back and do the

whole thing again and find me documents that are related to our

counterclaim, if you have any.  If she has a piece of jewelry

that maybe she gave to, you know, somebody, or whatever, I

don't know what relevance -- it has nothing to do with Topaze

or anything like that because we've done those searches.  So

we've definitely produced every document, I could tell you,

with an enormous amount of effort.  This is not us looking

to -- you know, I -- I don't agree with their assessment that,

you know, we're sitting here and we just don't want to do the

work.  We have done the work, and it was an enormous amount of

work to go through all these documents, and they were produced.

THE COURT:  How could you do this without agreeing on

search terms in the first place?

MR. MARCUS:  Well, actually --

THE COURT:  I'm going by my client's file, isn't that

the way it's done these days?  Not when I was a practicing

lawyer, because we didn't have search terms back then.

MR. MARCUS:  Right.

THE COURT:  Right?  But now that's what lawyers do.

MR. GRANTZ:  Your Honor, this is Dave Grantz.

It is fairly uncomplicated.  She has a phone.  She has

K41dstec
Teleconference

1   a computer.  She has email.  You upload that stuff to an

2   e-discovery company.  You provide them with the search terms.

3   They put it on the relativity platform, and then they do the

4   searches.  They tell you how many hits there are, and they tell

5   you how many search terms hit.  And then they say you have

6   60,000 hits and you have, you know, 20,000 pages of

7   deduplication and we're going to eliminate the deduplication.

8   Now you have 40,000 pages.  Then you narrow the search terms

9   down to the more relevant search terms, and then you produce

10  them to the other side.  And they put them on their relativity

11  platform, and they look at those documents in the way that we

12  look at documents today.  And we make the determinations as to

13  whether or not relevancy is an issue.  He doesn't get to make

14  that determination.  It is a broad standard for discovery, and

15  that's why e-discovery is so expensive and complicated, because

16  we have to have other companies come in and do the searches for

17  us.  But they don't want to give up her phone or her computer

18  to a company, and they don't want to expend the money with the

19  company to do the work that needs to be done.  But we want to

20  see that material, and we're not walking away from it.  We

21  certainly didn't waive our right to it by not agreeing to

22  specific terms.  We reserved our rights in connection with

23  this, and when they didn't produce anything of significance or,

24  you know, that was meaningful, we knew that they were either

25  not searching or they were withholding.

K41dstec
                        Teleconference

1           MS. KELLY:  Your Honor --

2           MR. MARCUS:  Dave Marcus here.

3           MS. KELLY:  I'm sorry.  Just as a follow up to what

4    Mr. Grantz was saying.  For example, plaintiff did not produce

5    any documents at all with her son, Tres, who was involved in

6    these issues.  He was the one that was involved, if the Court

7    remembers, in 2012 with retrieving earrings, ruby earrings,

8    that Topaze owned.  He retrieved them from Michele in

9    Switzerland, because Ms. Stewart was threatening that if

10   Michele did not turn those over for her to pay her counsel

11   fees, that Ms. Stewart was going to take her house away from

12   her.  Tres was the one and had multiple communications with

13   Michele regarding the retrieval of those earrings.

14           Tres has also submitted an affidavit in connection

15   with this matter in opposition to our motion to dismiss.  We

16   expect that there are multiple communications not only with Ms.

17   Stewart and Tres regarding that issue but also between Tres and

18   plaintiff counsel.  Those documents are not produced.  Barbara

19   also did not produce any communications with her husband.

20   There was only one, rather, communication with her husband.

21   That's just unbelievable considering that they created this

22   entity together 28 years ago and Mr. Stewart repeatedly

23   purchased pieces that were transferred to Topaze.  So these are

24   the types of documents that we're looking for.  They are

25   directly related to not only plaintiff's claims but also ours.

K41dstec
                              Teleconference

 1           And our -- the search terms that we proposed are

 2      directly -- you know, would directly hit these documents.

 3           MR. MARCUS:  Dave Marcus.  If I could respond?

 4           We had this conversation and I asked Ms. Kelly how

 5      they obtained documents from Ms. Bouman, and the response was

 6      that she went through her own emails and decided what was

 7      relevant and not.  So this was not a situation where they went

 8      to a service and looked through these, either.  And they're the

 9      ones that are saying that she took ownership.  I don't want to

10      repeat myself on this.  It seems to me Barbara Stewart was

11      asking repeatedly during this marital case:  Do you have any

12      documents?  I don't have anything.  Give them to me.

13           And so it is clear that she was not involved in any of

14      this either from a (unintelligible), or down the line in terms

15      of Topaze or DGBF, she didn't know what was going on.  She

16      never signed any documents.  All of them would be with either

17      Iglehart or Michele Bouman.

18           And what was produced -- apparently, Ms. Bouman didn't

19      haven't any.  But there was no effort -- and correct me if I'm

20      wrong, Ms. Kelly -- you told me, to my recollection, that she

21      just went through her own emails and produced what she felt was

22      relevant.  She culled out what she thought was relevant.  So

23      we -- you know, there was some understanding here that that was

24      the way it was done, and perhaps -- perhaps you would have to

25      do the same thing.  You know, if we are going to do this and

K41dstec
Teleconference

1    really get into detail on it, then both parties should be

2    subject to the same rules.

3        MS. KELLY:  Your Honor, it is correct that Ms. Bouman

4    conducted the search of her own emails.  We produced the

5    exhaustive search of search terms that she used.  There is no

6    assertion by plaintiff that there is any problem with the

7    production that Ms. Bouman provided.  There are other papers

8    that are submitted to the Court and on which we are

9    conferencing right now relate to the -- you know, as far as

10   plaintiff is concerned, our production is sufficient.

11       The problem here is the search terms and the way in

12   which Ms. Stewart conducted her search.  And like I said

13   before, we provided our search terms.  They refused to do other

14   similar search.  And when I was meeting and conferring with

15   Mr. Marcus, he admitted to me that they could probably do some

16   additional search terms, but then he refused to get into which

17   ones they did and which ones they would be willing to do, so

18   therein lies the problem and why we --

19       MR. MARCUS:  Dave Marcus responding.

20       That's is not true, Ms. Kelly, and we talked about

21   this.  And I said -- I admonish you not to say that, because we

22   had this conversation and you repeatedly made this comment.  I

23   told you what search terms we used.  We did Topaze both ways,

24   both spellings.  We did DGBF.  We looked through every document

25   that had anything to do with an email either from Iglehart or

K41dstec
                        Teleconference

 1  Michele Bouman, and we looked at the jewelry.  Those are the

 2  ones we looked at.  And that would have gotten anything, if

 3  there was an email with Tres or with Lisa Stewart or one of the

 4  children, it should have pulled that up, and anything that

 5  would have been relevant to this case it would have pulled up.

 6  We ran those searches and we did it with great detail, and I

 7  spent an enormous amount of time going through the enormous

 8  number of documents that I had in my file and, you know,

 9  whatever I had on the marital case, etc., etc.  And I think for

10  me to rerun searches where I just run Jeffrey Stewart, every

11  email for Jeffrey Stewart (unintelligible) is not going to come

12  up with anything else.  It's not going to deal with the jewelry

13  or Topaze or Tres Stewart.  It is not going to deal with any of

14  those.

15          MS. KELLY:  That's not what we asked for.

16          MR. MARCUS:  We have what we have.

17          MS. KELLY:  That's not what we asked for.  You know,

18  we asked for the search terms.  The Court has Exhibit D to

19  our --

20          THE COURT:  Excuse me.  Excuse me.

21          Mr. Marcus.

22          MR. MARCUS:  Yes.

23          THE COURT:  Did you personally run these -- whatever

24  search terms you used, did you personally run those because you

25  have somehow in your office the plaintiff's email collection?

K41dstec
                        Teleconference

1            MR. MARCUS:  I don't have her entire email collection,

2   but I have hundreds of thousands of pages of documents from

3   prior hearings, what have you, and from Barbara Stewart,

4   because I represented her for ten years.  I personally ran

5   those searches on all -- and we have -- I have tried to

6   accumulate them.  And I don't have their entire database of

7   emails.  I don't know that I am required to do that on her

8   emails.  That's the one thing that I have some -- I had some

9   emails from her.  I had some years ago, I had -- I had copied a

10  number of files from her.  But other than that, I asked her to

11  run it on her -- and I couldn't tell you when that email that

12  she has currently -- it is a Gmail account.  I couldn't tell

13  you when that started, but I asked her to run those -- those

14  other searches independently.  I personally ran the searches

15  from my end on everything that I had on my computer and every

16  document that we have in our files are computerized, and so,

17  you know --

18           THE COURT:  Let me interrupt you.

19           Mr. Marcus, does this mean that there has not been a

20  comprehensive search of the plaintiff's emails and her

21  computer?  Is that what it means?

22           MR. MARCUS:  I wouldn't say that.  I would say there

23  was a comprehensive search for those search terms that I just

24  described -- Topaze with an "e," Topaze without an "e," "EGBF,"

25  "Michele" as in Michele Bouman, "Iglehart," and "jewelry,"

K41dstec
Teleconference

1   those, which I would, I feel, are comprehensive.  I don't know

2   what else there could be that would generate anything relevant

3   to the issues that we're talking about in this case.  Those are

4   the search terms that I thought were -- but they want me to run

5   search terms of "rock" and, I don't know, some other -- "ring,"

6   "rock," "Jeffrey Stewart."  There are a number of names in

7   there of people, some I don't even know who they are.  And I

8   don't know what they would have to do with this.

9           THE COURT:  OK.  If the defendants committed their own

10  client to run the search of terms, then it's certainly

11  acceptable for the plaintiff to let the client run the search

12  terms.  So, why don't we have Mrs. Stewart run some additional

13  search terms.  If you guys can't agree on exactly which ones --

14  which additional terms Ms. Stewart ought to run searches on,

15  you can submit your agreements and disagreements to me and I'll

16  figure it out.  How is that?

17          MS. KELLY:  Sounds good, Judge.  Thank you.

18          MR. GRANTZ:  This is Dave Grantz.

19          It seems that that is the only resolution here,

20  because we don't believe that Ms. Stewart ran searches and we

21  don't believe that she is capable of running the searches.  And

22  we also don't believe that the production, you know, provides

23  the documents that exist, because we know from other

24  documentation that there were text messages and there were

25  emails and there were discussions between Tres and her about

K41dstec
Teleconference

1     the jewelry, and they just didn't produce any of them.  So we

2     know for a fact that there is documentation out there that

3     hasn't been searched or produced.  So if we can't agree, we are

4     certainly OK with your Honor making the call.

5          As for her doing the searches herself, look, everybody

6     is entitled to do that.  There is no requirement under the

7     rules that you hire a service to conduct a search.  The

8     requirement is that you do a complete search and produce all of

9     the responsive documentation, which hasn't been done here.  So

10    if we can't agree on it, then your Honor has to make a call and

11    issue an order; I agree with that.

12          THE COURT:  OK.  I think we've covered everything.

13          MS. KELLY:  Your Honor, there are a couple of

14    additional smaller issues that we --

15          THE COURT:  You are pushing it.

16          MS. KELLY:  I apologize, your Honor.

17          THE COURT:  You know, it is now one hour and about 15

18    minutes.

19          MR. GRANTZ:  We appreciate your Honor's patience with

20    us.  This is Dave Grantz.  We are all dealing with

21    circumstances, and we appreciate your helping on this call with

22    us and conducting this hearing via the phone.  Hopefully, if we

23    have to do this again, we will do it in person.

24          But Ms. Kelly is correct, there are a few other issues

25    that we should bring to your Honor's attention and get them

K41dstec
                    Teleconference

1   clarified so we can go forward.

2                   THE COURT:  Go ahead, quickly.

3                   MS. KELLY:  Your Honor, we would like plaintiffs to

4   use our definition of "jewelry" that we use in our request.  We

5   use the definition, to quote it, "Any item of jewelry owned at

6   any time by plaintiff or Topaze/DGBF."  We use that definition

7   because, of course, this action relates to the jewelry that

8   Topaze and DGBF owned, therefore those two should be included.

9                   THE COURT:  So what is the dispute about that?

10                  MS. KELLY:  The dispute is that plaintiff doesn't

11  believe that it should include -- the definition should include

12  any piece that the plaintiff has ever owned in her life.  The

13  reason, however, we included that --

14                  THE COURT:  No.  No.

15                  MS. KELLY:  -- plaintiff's jewelry, any jewelry she

16  owned in the definition, is because she has admitted under oath

17  multiple times that the whole purpose of establishing Topaze

18  was so that it would own all of her jewelry.  So I think this

19  is part of the issue, this plaintiff's production of documents,

20  is that they were picking and choosing.  Although they claim

21  that they did search for "jewelry," they may have been picking

22  and choosing which documents to include in the production,

23  because they were not -- they didn't accept our definition of

24  jewelry.

25                  THE COURT:  The plaintiff's substantive position here

K41dstec
                              Teleconference

1   is that for tax reasons she placed the jewelry into Topaze.

2   Obviously her position is that during her lifetime she got to

3   enjoy it and that after her life ended, that her granddaughters

4   were going to own it.  Her position is the defendant never

5   owned it.  But what -- I get that.  Defendants want to say that

6   somehow she became the owner of the plaintiff's jewelry.  But I

7   don't understand, given the plaintiff's position, why she would

8   fight with you about that definition.

9            MR. GRANTZ:  We don't understand it either.  This is

10  Dave Grantz speaking.  So that is one of the --

11           THE COURT:  What is wrong with their definition, given

12  your theory of the case?

13           MR. MARCUS:  Our position was that the issue should be

14  narrowed.  I thought the counterclaim was baseless and should

15  be dismissed and it would narrow the discovery.  For us to go

16  through in detail to do a detailed search for all documents on

17  any piece of jewelry that she ever owned at any point in time

18  in her life and, you know, I don't -- you know, it just

19  expands --

20           THE COURT:  Well, wait a second.

21           MR. MARCUS:  And it is not relevant.

22           THE COURT:  Wait a second.  If your position is that

23  some necklace belongs to your client and, lo and behold, the

24  defendant is in possession of that necklace now, isn't your

25  position that it isn't the defendant's?

K41dstec
                    Teleconference

1        MR. MARCUS:  Right.

2        THE COURT:  Why would you not -- look, I'm not

3   interested -- although, you know, maybe when you do it once,

4   you should just do the whole damn thing -- I'm not interested

5   in the damages question of what is the jewelry that plaintiff

6   has in her possession worth versus what is the value of the

7   jewelry that defendant has in her possession worth.  That is a

8   damages question, but --

9        MR. MARCUS:  That's where they are going.

10        THE COURT:  Well, that may be.  But you still are --

11   your position has to still be all of these pieces of jewelry

12   are mine and let me list them for you.  I own whatever it is,

13   40 pieces of jewelry.  Why would you not list everything that

14   you own?  And maybe, just maybe -- just a second -- maybe

15   knowing what the value of the jewelry in plaintiff's possession

16   is versus the value of the jewelry in defendant's possession

17   would be helpful when you try someday, God willing, to settle

18   this case.

19        MR. GRANTZ:  Your Honor, this is Dave Grantz, and that

20   brings up one other question.  The issue that we raised --

21        MR. MARCUS:  (unintelligible)

22        THE COURT:  Only one of you can talk.

23        MR. GRANTZ:  This is Dave Grantz.

24        The other -- that issue is a pertinent issue as well.

25   Ms. Kelly was probably going to get to it.  But we asked for

K41dstec
                       Teleconference

1    all of the jewelry that is in Ms. Stewart's possession, custody

2    and control right now to be produced to our appraiser today.

3    Obviously, the COVID-19 --

4              THE COURT:  I don't care about that.

5              MR. GRANTZ:  -- put a crimp in that, and,

6    unfortunately, we couldn't have that inspection done today.

7    But we are going to need that inspection to be completed at

8    some point so that we can see what jewelry she has and we can

9    determine what the value is because that may impact damages in

10   this case.

11             THE COURT:  OK.  I don't care about that right now.

12   Unless we get to some point where there is some greater

13   commitment to settlement, damages are separate.  They have

14   nothing to do with the history of Topaze and who was supposed

15   to have ownership of this jewelry and who is eventually

16   supposed to have ownership of it, and who was to enjoy it

17   during Ms. Stewart's lifetime.  OK?  I don't care what the

18   value of it is until you really want to talk settlement.

19             MS. KELLY:  Your Honor --

20             MR. MARCUS:  This is Dave Marcus.  If I can respond?

21   The Judge asked a question of me before.  I can respond.  Dave

22   Marcus.

23             With regard to the question of the list of jewelry, we

24   have suggested that we would do that if we could get a

25   correspondence, and I think -- and it has been done.  And Ms.

K41dstec
Teleconference

1   Kelly has prepared a list of what Ms. Bouman is in possession

2   of, and we have been in agreement that we would be happy to

3   produce a list of what Ms. Stewart had in her possession.  It

4   occurred to me that would be sufficient for, instead of going

5   and doing broad-based searches about each piece of jewelry

6   and -- you know, which could have nothing to do with any of the

7   issues in the case, we're happy to produce a list of what we

8   have in our possession, and maybe that would hopefully cut to

9   the chase and save everybody a lot of time, needless time.

10          THE COURT:  I don't think that what the defendants are

11   looking for is primarily a valuation question, though I think

12   it has obvious benefits.  What they're looking for in her

13   correspondence, they hope to find some kind of admission that

14   helps the defendant's position here on the merits.  And that,

15   apparently, is what has not been looked for.  And the potential

16   of emails between Ms. Stewart and her children, her husband,

17   might be useful.  I'm not sure why that wasn't fully explored

18   during the matrimonial, but I guess it wasn't.

19          MR. MARCUS:  Dave Marcus here.

20          I think it was.  I think that's what they have.  I

21   mean all the --

22          THE COURT:  Then when?  Then now that you will finally

23   stop resisting the disclosure of the records in the

24   matrimonial, then maybe some of that will be covered there and

25   make some of these issues clearer now.  But I don't really

K41dstec
                            Teleconference

1    see -- look, I have resolved the issue of search terms.  I

2    don't want to go back to it.  All right?

3            What else is left, Ms. Kelly?

4            MS. KELLY:  Your Honor, two additional issues, and

5    then we would just request the Court extend the time to conduct

6    those three depositions that we requested and also for our

7    demand of inspection.

8            But as far as the discovery issue is concerned, the

9    two issues are defendant is objecting to produce any documents

10   that she will identify or use as evidence at any hearing or

11   trial in this action.  She is claiming that that request is

12   vague and ambiguous and overbroad --

13           THE COURT:  I agree.  You can't ask that question.

14   That is not a good question.  No one knows what's going to be

15   used at trial.  As for documents, you don't ask for a

16   disclosure now of your trial exhibits.

17           MS. KELLY:  OK.  All we're asking, your Honor, is to

18   the extent plaintiff knows that there are particular documents

19   that she intends to use at trial --

20           THE COURT:  No.  Stop.

21           MS. KELLY:  OK.  Thank you, your Honor.

22           And the final discovery-related issue is related to

23   her affirmative defenses.  She refuses to produce any documents

24   relating or that could be factual support for her affirmative

25   defenses.  We believe that that's a proper subject of

K41dstec
                           Teleconference

1   discovery, however.

2             THE COURT:  I don't know what her affirmative defenses

3   are.  I don't know whether that actually makes any sense.  Most

4   lawyers put in, you know, a vast array of affirmative defenses

5   that are absolutely meaningless, and I don't know that you

6   really at this point really need that clarification.  I really

7   don't.

8             MS. KELLY:  Thank you.

9             THE COURT:  You are torturing each other sufficiently

10  otherwise I think.

11            MS. KELLY:  Thank you.  Thanks a lot.

12            THE COURT:  I don't care -- of course you can have an

13  adjournment, and it is kind of hard, you know, to know exactly

14  what makes sense, but maybe you guys can have a conversation

15  with regard to that.  It is really difficult, I appreciate it.

16            MR. GRANTZ:  This is Dave Grantz here.  I appreciate

17  that, your Honor.  Mr. Marcus and Ms. Kelly and I will meet and

18  confer, and we will put together a new scheduling order to

19  reflect the issues with COVID-19 and the other issues that

20  relate to the case, because even if we had hoped to get some of

21  this discovery completed in the next few months with these

22  depositions, that's going to be virtually impossible now.  We

23  don't even have courts open in New York.  We are not meeting

24  face-to-face.  And I would prefer not to take Ms. Stewart's

25  deposition by phone or by computer.

K41dstec
                            Teleconference

1             THE COURT:  OK.  Well, also, Ms. Stewart shouldn't be

2     seeing anybody.

3             MR. GRANTZ:  Right.  She is elderly, and we are

4     cognizant that we don't want anyone to get infected with the

5     virus.  We want to adhere to the respective governors' orders

6     in our states.

7             THE COURT:  Right.  Of course.  But, also, let's also

8     remember that maybe this COVID situation will maybe put a

9     little perspective into the case as a whole.

10            MR. GRANTZ:  Thank you, your Honor.

11            THE COURT:  And the lifetime of fighting, which is

12    just, you know, to me so antithetical to everything, you know,

13    I am as a human being.  So, you know, all I would say is when

14    you submit anything going forward, like a new schedule, put it

15    in the form of an order, which makes it something that's easier

16    for me to just sign, you know, like on the so-ordered line.

17            MR. GRANTZ:  Of course.

18            THE COURT:  Because it is more complicated doing this

19    all, you know, remotely.  And just, you know, I don't want to

20    start imposing any particular deadlines as to when the

21    attorney-client privilege briefing ought to come in, because,

22    honestly, I don't know what your personal situations are, and I

23    recognize the total uncertainty of where we are even going to

24    be three months from now.  So, if you could talk to each other

25    and work out a comprehensive schedule, I would find that very

K41dstec
                        Teleconference

1    useful.

2            MR. GRANTZ:  We will do that, your Honor.

3            THE COURT:  Put it in a -- you know, make it as easy

4    as possible for me to sign my name.

5            MR. GRANTZ:  Your Honor, is it possible for there to

6    be an order for alternative dispute resolution?  Maybe that can

7    bring us to a resolution of this case.  I don't know that we

8    can do that --

9            THE COURT:  Yeah.  I think that a mediation may be

10   somewhat functional on a remote basis.  I guess my sort of

11   issue with that would be that I know how complicated this is

12   that I think it would be just awfully hard to try to do, you

13   know, a settlement conference remotely without everybody there.

14   To me, it would be very challenging.

15           MR. GRANTZ:  I just want to raise it so that maybe we

16   can get through some of this discovery and then revisit it.

17           THE COURT:  Sure.  It is a clear problem.  You know,

18   there may be some availability.  You know, I just don't know

19   how you do a kind of settlement where you can't ask someone to

20   sort of leave the room, you know, sort of --

21           MR. GRANTZ:  I completely agree.

22           MS. KELLY:  Your Honor, actually, I was on the phone

23   with some other attorneys yesterday who had just come out of a

24   mediation, and the way that the mediator conducted it was to

25   call the one party with the attorney on the line, discuss it

K41dstec
Teleconference

1   with them, and then hang up, and then call the other attorney

2   with their party, and at some point the mediator asked for the

3   party to get off the line so that the mediator could just speak

4   with the attorney.  And the lawyer reported that the case

5   wasn't settled but it wasn't because of the issues with

6   navigating the phone lines.  I've participated in mediation

7   before the Southern District magistrates before.  It is very

8   great -- you know, it is very great, so that's what we would be

9   interested in doing, if your Honor --

10          THE COURT:  Do you recall, I can look it up, but who

11   your magistrate judge is in this case?

12          MS. KELLY:  Judge -- oh, in this case?

13          MR. GRANTZ:  I don't think we have one, Judge.  I

14   think you are on your own.

15          THE COURT:  No, I'm never on my own.

16          MR. GRANTZ:  Usually they --

17          THE COURT:  No.  Hold on a second.  I can pull this up

18   on my --

19          MR. GRANTZ:  This is Dave Grantz.  I'm surprised that

20   we have a magistrate judge.  I would have thought that the

21   magistrate judge would have dealt with all of these discovery

22   issues.

23          THE COURT:  No.  I was a magistrate judge for 19

24   years.  I have learned as a district judge that there are fewer

25   disputes if you have to talk to me.  OK?  I find that, you

K41dstec
                        Teleconference

 1    know, lawyers feel a little bit more constrained.

 2            MS. KELLY:  Your Honor, I believe it is Magistrate

 3    Judge -- your Honor, I believe Magistrate Judge Cott has been

 4    designated.

 5            THE COURT:  OK.  Well, you know, I don't know -- you

 6    know, if you want to revisit it at some point, then I will

 7    certainly, you know, ask him what his capacity from home is,

 8    you know, to engage in settlement discussions with you.

 9            MR. GRANTZ:  I appreciate that, Judge.

10            THE COURT:  Just let me know when it is truly ripe.

11            MR. GRANTZ:  We'll meet and confer and get back to

12    you.

13            THE COURT:  OK.  All right.  Sounds good.

14            MR. GRANTZ:  Thank you.

15            THE COURT:  OK.

16            MR. GRANTZ:  Thanks for giving us the time today.

17            THE COURT:  OK.

18            MS. KELLY:  Your Honor, thank you so much for all your

19    help.  I hope that you remain healthy.

20            THE COURT:  I am going to try.  You, too.

21            MS. KELLY:  Thanks.

22            THE COURT:  Very good.  Goodbye.

23            (Adjourned)

24

25